**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ALONZO TAYLOR,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>AMCOR FLEXIBLES INC.,<br><br>　　　　　　　Defendant. | Civil No. 07-3477-NLH-JS<br><br><br>**OPINION** |

**APPEARANCES:**

Anthony J. DiMarino, III, Esquire
A.J. DiMarino, III, P.C.
57 Euclid Street, Suite A
Woodbury, NJ 08096

H. Frances DeLone, Jr., Esquire
P.O. Box 361
Wayne, PA 19087

　　　*Attorneys for Plaintiff*

Devjani Mishra, Esquire
Douglas B. Lipsky, Esquire
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018-1405

　　　*Attorneys for Defendant*

**HILLMAN**, District Judge

　　　This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment on Counts I and II of his Complaint and Defendant's Motion for Summary Judgment.  For the reasons expressed below, Plaintiff's Motion will be denied, while Defendant's Motion will be granted in part and denied in part.

I.  **BACKGROUND**

Plaintiff, Alonzo Taylor, an African American male, was hired by Defendant, Amcor Flexibles, Inc. ("Amcor"), on January 18, 2005 as a Regional Sales Representative.  Amcor's Director of Regional Sales, Christopher Heezen, was Plaintiff's immediate supervisor and made the ultimate decision to hire him.  At the time he was hired, Plaintiff received a $15,000 signing bonus, which was the highest of any Regional Sales Representative, as well as an annual base salary of $90,000, which was the second highest of any Regional Sales Representative.  Heezen's compensation was based in part on the performance of the sales representatives who reported to him.

Plaintiff's employment commenced on February 14, 2005.  At that time, he was assigned the Mid-Atlantic Territory, which was assessed by Amcor to have the highest growth potential of any sales territory.  All of Amcor's sales territories have unique features, including size, location, clients located within, and industries in the territory.  Accordingly, in order to evaluate the performance of an individual territory, its numbers are compared with the sales goals for that territory, and not with the sales numbers for other territories.

Plaintiff's duties as a Regional Sales Representative included growing sales by closing new business deals, managing and maintaining customer relationships, budgeting future sales,

2

and meeting sales commitments.  Further, Heezan set certain sales goals for Plaintiff, which were communicated to him. Specifically, Plaintiff had the third lowest sales quota of the seven Regional Sales Representatives.  Plaintiff was to grow his territory by building upon certain large institutional clients, including Terumo Medical, Nice Pak, and Dade Diagnostics. Plaintiff was also to target prospective clients with significant growth potential, including Convatec, Corning, Con Med, Bard Canada, and Nalge Nunc.

In November 2005, Heezen reviewed Plaintiff's sales figures in order to evaluate his performance.  The sales figures revealed that Plaintiff had failed to make any sales to Convatec, was more than 40% below budget in sales to Nalge Nunc, almost 20% below budget in sales to Con Med, and almost 40% below budget in sales to Bard Canada.  Beyond Plaintiff's sales figures, Heezen was also concerned with Plaintiff's communication skills and general competency.  Plaintiff allegedly failed to respond to Heezen's requests for information on a number of occasions, and ignored Heezen's directive that he travel to Wisconsin to learn about a client's operations there.  Also, Plaintiff's reports were allegedly incomplete or incorrect on a number of occasions. Further, Plaintiff allegedly failed to return calls from clients on a number of occasions, leading the clients to seek assistance from other Amcor employees and in one instance complain directly

3

to the President of Amcor about the service they received.

On November 16, 2005, Heezen sent Plaintiff an email outlining four general areas in which Plaintiff needed to improve his performance.  They were: (1) taking better control of his accounts; (2) being more proactive in communicating with clients; (3) taking a leadership role with his clients and visiting Nice Pak's facility in Wisconsin; and (4) improving his reporting.  In response to this email, Plaintiff acknowledged having delayed his visit to Wisconsin, and that some of his reports had been late and inaccurate.

Thereafter, on December 5, 2005, after consulting with a member of Amcor's Human Resources Department, Elissa Reiner, Heezan placed Plaintiff in a sixty-day Performance Improvement Plan ("PIP").  This PIP was intended to advise Plaintiff of specific problems with his performance and provide him with a concrete action plan for improvement.  The PIP identified seven different areas that Plaintiff was to improve, including the accuracy of his reports and increasing his sales numbers.

After having been given his PIP, Plaintiff continued to have problems with his performance.  His reports continued to be inaccurate in a number of ways.  Plaintiff also submitted a client presentation that contained inaccurate information.  Further, Plaintiff continued to miss deadlines for the submission of certain reports.  Finally, Defendant asserts that Plaintiff's

sales figures continued to be below budget for certain key clients.  Specifically, Defendant asserts that Plaintiff was 100% below budget for Convatec, more than 50% below budget for Nalge Nunc, more than 30% below budget for ConMed, and 29% below budget to Bard Canada through February 2006.  Plaintiff allegedly failed to close any substantial new business during his time at Amcor.  Having determined that Plaintiff failed to improve his performance during his sixty-day PIP period, after consulting with Reiner and others, Heezen decided to terminate Plaintiff's employment.  Plaintiff was thereafter terminated on February 16, 2006.

On May 5, 2006, Plaintiff filed a charge of racial discrimination against Defendant with the New Jersey Division on Civil Rights and the Equal Employment Opportunity Commission.  One month later, on June 5, 2006 at 5:13 a.m., Plaintiff alleges that a person called his home and screamed the words, "nigger, you filed a complaint against us," when his wife answered the phone.  The Caller ID function on Plaintiff's telephone indicated that the call was made from a phone assigned to Rexam Healthcare, and organization owned by Defendant.  The telephone service provider for the facility from which the call was allegedly made has certified that no call was made by the phone number at issue to Plaintiff's home between June 1, 2006 and June 8, 2006.

At some point following his termination, Amcor responded to a request for information from a potential employer of Plaintiff. Pursuant to an authorization signed by Plaintiff, Amcor released information verifying that Plaintiff had been employed by the company, but was ineligible for rehire because he was "released for performance."

On July 27, 2007, Plaintiff filed his Complaint in this case, alleging counts for discrimination, retaliation, and defamation.  Defendant now moves for summary judgment on Plaintiff's claims.  Plaintiff also moves for summary judgment on Counts I and II of his Complaint.

## II.   **DISCUSSION**

### A.   **Jurisdiction**

Plaintiff brought his claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, as well as pursuant to the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-12(a), and New Jersey common law.  The Court has jurisdiction over Plaintiff's federal claim under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).[1]

---

[1] The complaint also asserts diversity jurisdiction under 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

**B.    Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56.

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits

or otherwise, specific facts showing that there is a genuine issue for trial. <u>Id.</u>  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

**C.  Analysis**

**1.  Wrongful Termination Claim**

In Count I of his Complaint, Plaintiff asserts that Defendant fired him solely on the basis of his race in violation of both Title VII and the NJLAD.  Plaintiff claims that prior to his termination on February 16, 2006, his performance "was very good in all aspects, including but not limited to the increase in sales he achieved for his territory and the new business he brought in," and that Defendant did not discharge similarly situated white employees.  (Compl. at ¶¶ 10-13.)

Where there is no direct evidence of discrimination,[2] race discrimination claims under both Title VII and NJLAD are analyzed under the now familiar <u>McDonnell Douglas</u> burden-shifting

---

[2] Although Plaintiff argues that the fact that he allegedly had better sales numbers than other white employees and was terminated while they were not is direct evidence of discrimination, this is in fact merely circumstantial evidence and will be addressed as such.

framework.[3]  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Pepper v. Princeton Univ. Bd. Of Trustees, 389 A.2d 465, 479 (N.J. 1978).  Under this analysis, a plaintiff must first establish a prima facie case of racial discrimination by showing that: (1) he belongs to a protected class; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the employer sought someone who is not a member of the protected class to perform the same work after the plaintiff's termination, or similarly situated employees who are not members of the protected class were not subjected to the adverse action. See McDonnell Douglas, 411 U.S. at 802; Jones v. School Dist. of Phila., 198 F.3d 410-11 (3d Cir. 1999).

Once the employee establishes a prima facie case of discrimination, the burden of production shifts to the employer to submit a legitimate, nondiscriminatory reason for discharging the employee.  McDonnell Douglas, 411 U.S. at 802.  Where the employer is able to articulate a legitimate reason for the

---

[3] Both the Third Circuit and New Jersey courts have long recognized the symmetry between discrimination claims under the NJLAD and Title VII.  See McKenna v. Pacific Rail Serv., 32 F.3d 820, 827 (3d Cir. 1994) ("The New Jersey Supreme Court has generally looked to standards developed under federal anti-discrimination law for guidance in construing the LAD."); Grigoletti v. Ortho Pharmaceutical Corp., 570 A.2d 903, 912 (N.J. 1990) ("We have recognized a . . . need to harmonize our LAD with Title VII and have borrowed heavily from the federal experience to assure some reasonable degree of symmetry and uniformity.").

unfavorable employment decision, the presumption of discrimination arising from prima facie case drops away, leaving the burden on employee to prove by a preponderance of the evidence that the employer's proffered reasons were pretextual. See id.; Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); Clowes v. Terminex Intern, Inc., 538 A.2d 794, 805 (N.J. 1988).

### a.   Prima Facie Case

Plaintiff has presented sufficient evidence to establish a *prima facie* case of discrimination.  It is undisputed that Plaintiff, an African American, is a member of a protected class and that he suffered an adverse employment action when he was terminated.  Accordingly, the only questions are whether Plaintiff performed his job at a level that satisfied his employer's reasonable expectations and whether he was treated more harshly than other similarly situated individuals outside his protected class.  Each shall be addressed in turn.

First, Plaintiff asserts that he performed his job up to the reasonable expectations of Amcor because the sales figures for his territory were 47.5% higher than those achieved in the prior fiscal year, and that this increase was larger than that achieved by any of the other Regional Sales Representatives in their respective territories.  Plaintiff has presented evidence that he was on pace to meet his annuals sales quota.  Specifically, the record contains Plaintiff's Monthly Territory Sales Reports for

10

the months of January, March, and November of 2005, as well as February of 2006.  During each of those months, Plaintiff exceeded his overall sales quota, with overall sales numbers that were 9.3%, 5.3%, 8.8%, and 5.0% above quota, respectively. Accordingly, the Court finds that Plaintiff has presented sufficient evidence to establish this element of his prima facie case.

Second, Plaintiff asserts that he was treated differently than other similarly situated individuals who are not members of his protected class.  Specifically, Plaintiff argues that other white Regional Sales Representatives were not terminated even though the increase in sales numbers in their territories over the prior year were not as large as the increase in the sales numbers of Plaintiff's territory.  There is evidence in the record that Plaintiff's performance with respect to his sales quota was comparable to the performance of other white Regional Sales Representatives who were not terminated.  Accordingly, the Court finds that Plaintiff has presented sufficient evidence to support the fourth element of a prima facie case.

### b.   Legitimate Reasons

While Plaintiff has established a prima facie case, Defendant has presented legitimate, non-discriminatory reasons for terminating his employment.  "The employer satisfies its burden of production by introducing evidence which, taken as

true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes, 32 F.3d at 763 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993)); see also Maiorino v. Schering-Plough Corp., 695 A.2d 353, 364 (N.J. Supp. Ct. App. Div. 1997). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Fuentes, 32 F.3d at 763. This is a light burden. Id.

Defendant asserts that Plaintiff was terminated for several well documented performance issues after having been notified of his shortcomings and given an opportunity under the PIP to improve. First, Defendant argues that Plaintiff failed to achieve sales goals that were set for him for certain important clients. Second, Defendant argues that Plaintiff failed to communicate effectively with Heezen and other Amcor employees. Finally, Defendant argues that Plaintiff failed to communicate effectively with certain Amcor clients. These reasons are both sufficiently legitimate and non-discriminatory to meet Defendant's light burden.

### c. Pretext

Since Defendant has established legitimate and nondiscriminatory reasons for terminating Plaintiff's employment,

for Plaintiff to be successful on his discrimination claims he
must provide evidence that Defendant's reasons were pretextual.
To meet this burden of persuasion, a plaintiff must point to some
evidence, direct or circumstantial, from which a factfinder
could reasonably disbelieve the employer's articulated legitimate
reasons or believe that an invidious discriminatory reason was
more likely than not a motivating or determinative cause of the
employer's action.  See Fuentes, 32 F.3d at 763 (citing Hicks,
509 U.S. at 508); Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983
F.2d 509, 523 (3d Cir. 1992).  In other words, a plaintiff must
prove "weaknesses, implausibilities, inconsistencies,
incoherencies, or contradictions in the employer's proffered
legitimate reasons for its action that a reasonable factfinder
could rationally . . .  infer 'that the employer did not act for
[the asserted] non-discriminatory reasons.'"  Fuentes, 32 F.3d at
765 (quoting Josey v. John R. Hollingsworth Corp., 996 F.2d 632,
638 (3d Cir. 1993)).

Plaintiff claims that Defendant's reasons for terminating
him are pretextual in a number of ways.  First, Plaintiff argues
that his sales performance was superior to the other Regional
Sales Representatives, allegedly none of whom were terminated,
based on year to year increases in total sales.  As a corollary
to this argument, Plaintiff asserts that Defendant's reliance on
"budgeted sales projections" instead of raw year over year sales

13

gains allegedly contradicted its own policies.  However, Plaintiff's reliance on total sales from year to year is misplaced.[4]  The sales quota set for each Regional Sales Representative is the figure that mattered, and it is not for this Court to second guess the methods Amcor selected to evaluate its employees.  See Walton v. Mental Health Association of Southeastern Pa., No. 96-5682, 1997 WL 717053, at *8 (E.D. Pa. Nov. 17, 1997) (finding that "employers are entitled to make employment decisions which are unpopular, unwise, and even unjust as long as they do not do so for discriminatory reasons"), aff'd, 168 F.3d 661 (3d Cir. 1999); Rhett v. Carnegie Ctr. Assoc., 129 F.3d 290, 297 (3d Cir. 1997).

---

[4] The record is clear that Amcor employees were not judged by their sales numbers compared to previous years or by their gains over previous years compared to the gains of other employees. Each sales territory was unique and in a constant state of flux, with both existing and potential clients entering and leaving the territory.  Based on the differences between their territories, the Regional Sales Representatives could not be compared with one another based solely on total sales.  Likewise, based on the differences in the same territory from one year to the next, a single Regional Sales Representative's performance could not be compared to his performance in prior years based solely on total sales.  Accordingly, Plaintiff's reliance on the 47.5% increase in his territory's sales over the previous year is misplaced. Rather, the key measurement at Amcor was the employees' performance with respect to their sales quotas.  The sales quotas are territory specific and year specific forecasts of the sales that should be obtained for that particular territory.  The sales quotas are set by Heezen, who adjusted the sales figures from the prior year for changes in the composition of each territory and any increases in product prices, among other things.  It was by this sales quota that Regional Sales Representatives were measured against their prior performance and each other.

Plaintiff's argument on this issue reveals a fundamental misunderstanding on his part about the sales quotas that were set for him.  Plaintiff asserts that the sales quotas were determined by taking the prior year's sales and simply increasing that figure by between 5% and 7.5%.  However, the deposition of Heezen, which Plaintiff relies upon in support of this assertion, does not stand for that proposition.  Heezen testified that the 5% to 7.5% increase Plaintiff refers to was the overall growth expected for the entire region managed by Heezen, not for the individual territories that the Regional Sales Representatives were responsible for.  Heezen could not recall the highest that a quota was set above the prior year's sales for individual sales territories during his deposition, although he testified that the range from territory to territory "varied quite a bit."

Plaintiff also seems to confuse the words used by Amcor to describe the basis used for evaluating the performance of its Regional Sales Representatives.  Plaintiff argues that "budgeted sales listings" had no bearing on the bonuses paid to Regional Sales Representatives, and that an increase over the prior year's sales numbers is all that mattered.  That is incorrect.  The deposition testimony of Heezen, upon which Plaintiff relied for his argument, makes clear that bonuses were determined with reference to whether a sales representative achieved or exceeded his or her sales quota.  As discussed above, sales quotas were

determined by adjusting the sales figures from the prior year for changes in the composition of each territory and any increases in product prices, among other things.  In that sense, the term "sales quota" is interchangeable with the term "budgeted sales listings" used by Plaintiff.  Accordingly, Plaintiff's arguments on this front serve only as evidence of his confusion on how the performance of Regional Sales Representatives was measured, and not of pretext.

When Plaintiff's performance with respect to his sales quota is reviewed, he was not the top performing Regional Sales Representative as he alleges.  While Plaintiff did slightly exceed his sales quota for each of the four months for which records are available, the record reveals that all of the other Regional Sales Representatives exceeded their quota as well. Further, two individuals exceeded their quotas for the entire year by a larger percent then Plaintiff achieved for any of the four months for which his records are available.

Moreover, Defendant's critique of Plaintiff's sales numbers was not that his overall numbers were off, but that he was significantly below quota for certain important clients.  The record makes clear that Plaintiff was made aware that he was to place particular "emphasis" on Convatec, Corning, ConMed, Bard Canada, and Nalge Nunc.  The record also makes clear that with respect to these particular clients Plaintiff was significantly

below the sales quotas set for him.  Plaintiff has failed to present any evidence that any of the other Regional Sales Representatives were similarly below quota for significant individual clients within their territories.  In the absence of such evidence there is nothing to demonstrate that Defendant's concern with Plaintiff's sales numbers was pretextual.  See Osuala v. Community College of Philadelphia, No. 00-98, 2000 WL 1146623, at *7 (E.D. Pa. Aug. 15, 2000) (finding that evidence of other employees receiving less severe discipline than the plaintiff is insufficient to raise the specter of invidious racial discrimination unless the quantity and quality of misconduct was very similar), aff'd, 259 F.3d 717 (3d Cir. 2001).

Second, Plaintiff argues that Defendant's proffered reasons for terminating him are pretextual because many of them were allegedly not identified in the PIP, which Defendant's corporate representative testified at her deposition contained all of the reasons for Plaintiff's ultimate termination.  Specifically, Plaintiff argues that his sales to Convatec, Conmed, Bard Canada, and Nalge Nunc were not specifically mentioned in the PIP, and were only made important after the fact as a justification for Plaintiff's termination.  Plaintiff also seems to argue that the many emails attached to the Affidavit of Christopher Heezen as evidence of Plaintiff's poor communication and client relations are evidence of pretext because they were not identified in the

PIP.

These arguments are flawed.  Although the PIP did not mention those clients by name, it clearly set as two of Plaintiff's objectives closing new business and acquiring higher value added business.  Further, Plaintiff had been previously instructed that his responsibilities included "cultivat[ing] new business with particular emphasis on Convatec, Corning, and ConMed[,] as well as at places where previous sales reps have provided inroads like Bard Canada and Nalge Nunc."[5]  (Affidavit of Christopher Heezen at Exhibit D.)  The PIP also generally referenced Plaintiff's need to improve on his poor communication and client relations in a number of ways.  For example, the PIP set one of Plaintiff's objectives as achieving "much better information flow in to organization and much better accuracy to drive decision making."  The PIP also notified Plaintiff that he needed to "[i]mprove quality [of] information provided on Requests for Quote, New Product Development Forms, etc."  Accordingly, the Court finds nothing about what was allegedly not included in the PIP from which a reasonable jury could find Defendant's proffered reasons to be pretextual.

_____

[5] Plaintiff's assertion that his sales to those companies exceeded the sales that were made to them the previous year is also flawed.  As discussed elsewhere, Amcor sales figures were evaluated with reference to the sales quotas set for each client, territory, etc. and not with respect to sales from the prior year.

18

Third, Plaintiff takes issue with Defendant's argument that his sales to NicePak, Terumo, and Dade International should be discounted when evaluating his performance.  In its Reply Brief in Support of its Motion for Summary Judgment, Defendant argues that Plaintiff's overall sales performance was not as strong as it may appear because the strong numbers for NicePak, Terumo, and Dade International were attributable to either the organic growth of those companies or the efforts of others, and not due to any work done by Plaintiff.  To make such an argument, Plaintiff asserts, is evidence of pretext because Plaintiff was specifically directed to emphasize sales to those clients in the PIP.  However, directing Plaintiff to emphasize sales to particular clients does not preclude Defendant from subsequently being displeased with Plaintiff's efforts on that front, or making the case that Plaintiff did not follow the directive given him despite accruing positive numbers.  In short, there is nothing about Defendant's argument that makes its proffered reasons for terminating Plaintiff implausible or inconsistent, or suggests that they were merely pretext.

Fourth, Plaintiff offers the declarations of Stacey Hammer and Virginia Cullison, two former Regional Sales Representatives at Amcor, as evidence that Heezen discriminated against the two of them on the basis of their gender.  However, such evidence does nothing to undermine Defendant's proffered reasons for

19

terminating Plaintiff, as evidence of alleged gender discrimination is not relevant for proving a claim of racial discrimination.  See <u>Simonetti v. Runyon</u>, No. 98-2128, 2000 WL 1133066, at *6 (D.N.J. Aug. 7, 2000) (finding that "[p]ursuant to Federal Rules of Evidence 401 and 403, the plaintiff may not use evidence of one tye of discrimination to prove discrimination of another type"), <u>aff'd</u>, 276 F.3d 579 (3d Cir. 2001); <u>Lanni v. New Jersey</u>, 177 F.R.D. 295 (D.N.J. 1998) (finding that allegations regarding one form of discrimination are inadmissible and irrelevant to a claim for another form of discrimination).

   In fact, the Declarations of Hammer and Cullison serve to undermine Plaintiff's claims.  Both Hammer and Cullison, who are white, assert that they were deemed by Heezen to be poor performers in spite of allegedly high sales numbers.  Hammer asserts that after she left Amcor, Heezen determined that she was not eligible for re-hire because she was a poor performer. Similarly, Cullison asserts that she was placed on a PIP by Heezen.  In the face of such evidence, Plaintiff would be hard-pressed to convince a reasonable fact finder that an invidious discriminatory reason was more likely than not a motivating or determinative cause of his termination.  <u>Cf.</u> <u>CBOCS West, Inc. V. Humphries</u>, 128 S. Ct. 1951, 1963 (U.S. 2008) (Thomas, J., dissenting) (noting that an employer who treats African-American and white employees similar "has not discriminated on the basis

of anyone's race").

Fifth, Plaintiff asserts that he did not have any problems with his communication with clients or with Heezen.  In support of his position, Plaintiff relies upon the Declarations of Cullison and Ken Pouliot, a former Amcor sales representative, as well as his own allegations.  In her Declaration, Cullison asserts that "when [she] had communications with him [she] found his communications to be good."  Pouliot asserts in his Declaration that since departing Amcor he has stayed in contact with individuals from Nice Pak, Dade, and Terumo, and that these individuals all found Plaintiff to be a good communicator.  It is well established, however, that a party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana, 260 F.3d at 232.  These vague generalizations about Plaintiff's communication skills do not address any of the specific problems highlighted by Defendant.  Defendant identified at least six documented breakdowns in Plaintiff's communications with clients for which Plaintiff has offered only his own unsupported allegations in rebuttal.  Likewise, Plaintiff has offered nothing beyond his allegations to address his alleged communication problems with Heezen.  Accordingly, the Court finds that no reasonable jury could rationally infer that Defendant did not terminate Plaintiff for the legitimate reasons proffered based upon the vague

21

generalizations presented.

Finally, although Plaintiff made no arguments about this issue in his briefs, the Court notes that there is evidence in the record that Heezen made a comment to Plaintiff of a racial nature.  Specifically, in January 2006, Heezen allegedly made remarks to Plaintiff to the effect that black men know how to post-up in the low post, but do not know the medical packaging business.  In response, Plaintiff allegedly stated that he was the type of player who could not post-up his grandmother.  At his deposition, Plaintiff testified only that the statement "could be" interpreted as discriminatory.  Indeed, courts have held that such comments are insufficient to demonstrate pretext.  See Robinson v. Montgomery Ward & Co., 823 F.2d 793, 795 (4th Cir. 1987) (finding comment by plaintiff's supervisor that "blacks could not succeed at anything but sports" was insufficient to demonstrate discriminatory animus or pretext); Perry v. Prudential-Bache Secs., Inc., 738 F. Supp. 843, 853 n.5 (D.N.J. 1989) ("[O]ff-hand comments of a joking nature are rarely considered to create sufficient doubt so as to raise an inference of intentional discrimination."), aff'd, 904 F.2d 696 (3d Cir. 1990).  The comment is also tempered by the fact that Heezen was the one who initially hired Plaintiff.  See Maidenbaum v. Bally's Park Place, 870 F. Supp. 1254, 1266 n.24 (D.N.J. 1994) ("Employers who knowingly hire workers within a protected group

seldom will be credible targets for charges of pretextual
firing.") (internal quotes omitted), aff'd, 67 F.3d 291 (3d Cir.
1995); Young v. Hobart West Group, 897 A.2d 1063, 1070 (N.J.
Super. App. Div. 2005) (noting that employee having been hired
and fired by same person "strongly counters against inference of
discrimination"). Accordingly, the Court finds this to be simply
a stray remark, which no reasonable jury could find Defendant's
proffered reasons to be pretextual upon. See Armbruster v.
Unisys Corp., 32 F.3d 768, 779 (3d. Cir. 1994) (holding that a
single comment, is not sufficient evidence to establish a pattern
of discrimination, even if that comment is made by a supervisor);
Salkovitz v. Pioneer Electronics (USA), Inc., 188 Fed. Appx. 90,
94 (3d Cir. 2006) (finding comments, taken in light of the strong
evidence that he was not qualified for the job, don't suggest
"hidden motivations").

    Thus, Plaintiff has failed to carry his burden of creating a
genuine issue of material fact with respect to whether
Defendant's proffered legitimate reasons for terminating him were
pretextual. Summary judgment must therefore be entered against
Plaintiff on Count I of his Complaint.

    **2. Retaliation Claim**

    In Count II of his Complaint, Plaintiff asserts that
Defendant retaliated against him after he filed a complaint with
the Equal Employment Opportunity Commission ("EEOC") in violation

of both Title VII and the NJLAD.  After he filed his EEOC
complaint, Plaintiff alleges that a harassing phone call was made
to his home by someone using a phone number registered to
Defendant.

Claims of retaliation under both Title VII and the NJLAD are
analyzed under the well established burden shifting framework of
McDonnell Douglas described above.[6]  See 411 U.S. at 803-05.
Under that framework, a plaintiff must first establish a *prima
facie* case by showing that: (1) he engaged in protected employee
activity; (2) the employer took adverse action against him after,
or contemporaneous with, his activity; and (3) a causal link
exists between his activity and the employer's action against
him.  Muzslay v. City of Ocean City, 238 Fed. Appx. 785, 789 (3d
Cir. 2007) (citing Abramson v. William Paterson College, 260 F.3d
265, 286 (3d Cir. 2001)).  Should the plaintiff establish a *prime
facie* case, a presumption of discrimination is created and the
burden of production shifts to the defendant to articulate some
legitimate, nondiscriminatory reason for its actions.  McDonnell
Douglas, 411 U.S. at 803.  Once the employer answers its
relatively light burden by articulating a legitimate,
nondiscriminatory reason for the unfavorable employment decision,
the burden of production rebounds to the plaintiff, who must show

---

[6] As discussed above, both the Third Circuit and New Jersey
courts have recognized the symmetry of between retaliation claims
under Title VII and the NJLAD.

by a preponderance of the evidence that the employer's explanation was merely a pretext for its actions, thus meeting the plaintiff's burden of persuasion.   Id.

The parties do not dispute that Plaintiff's EEOC complaint constitutes protected activity.  Accordingly, the only question is whether Defendant took an adverse action against Plaintiff because he filed his complaint.  Plaintiff asserts that approximately one month after he filed his EEOC claim, someone called his house at 5:13 a.m. from a phone number registered to Rexam Healthcare, a subsidiary of Amcor, and said, "Nigger you filed a complaint against us."  (Pl. Stat. of Mat. Facts at ¶¶ 15-16.)  As evidence of the phone call, Plaintiff has submitted a photograph of the Caller-ID screen from his telephone.

In opposition, Defendant argues that these alleged statements are inadmissible hearsay, because it was Plaintiff's wife who picked up the phone and heard them.  Defendant also argues that the photograph of Plaintiff's Called-ID is inadmissible because it is not authenticated.  Further, Defendant argues that the phone call at issue never occurred.  In support of this argument, Defendant provides a certification from TDS Telecommunications Corporation, the service provider for the phone number that allegedly called Plaintiff, which sets forth that no calls were made from that number to Plaintiff's home between June 1 and June 8, 2006.  Finally, Defendant argues that

Plaintiff has failed to present any evidence that anyone at the facility where the phone used to make the call was located had any knowledge of Plaintiff's protected activity, and so Plaintiff cannot demonstrate that the call was causally linked to his EEOC claim.

The Court does not find Defendant's evidentiary concerns persuasive.  The statements at issue are not being offered for the truth of the matter asserted and accordingly do not fall within the definition of hearsay.  See Fed. R. Evid. 801(c).  The Court is likewise satisfied that the photograph of the Caller-ID has been sufficiently authenticated.  Although Plaintiff did not take the photograph in question he identified the picture as being of his Caller-ID in his Declaration.

With respect to whether the phone call at issue ever occurred, Plaintiff argues that the fact that the service provider has no record of the call is not dispositive of the issue.  Plaintiff asserts that the caller could have placed the call using a credit card, in which case the call would allegedly not appear on the company's phone records.  While Defendant dismisses Plaintiff's argument as mere conjecture, in the face of the Caller-ID information on Plaintiff's telephone and his testimony, in addition to the possibility that the telephone service providers records are not dispositive, the Court cannot find at this time that no reasonable jury could return a verdict

in Plaintiff's favor on this issue.

Finally, Defendant's argument that Plaintiff cannot demonstrate a causal relationship between the alleged harassing phone call and his protected activity ignores the alleged substance of the call itself.  Plaintiff alleges that the caller stated "you filed a complaint against us."  This statement by itself is capable of creating a genuine issue of material fact with respect to the causal relationship between the call and Plaintiff's protected activity.  Thus, the Court finds that while Plaintiff has failed to establish that no reasonable jury could find for Defendant on this claim, a genuine issue of material fact exists as to whether Plaintiff was subjected to a harassing telephone call in response to his filing of a protected EEOC claim.[7]  The motions of both parties for summary judgment on Count II must therefore be denied.

### 3.  Defamation Claim

In Count III of his Complaint, Plaintiff alleges that Defendant defamed him by informing a potential employer that he was terminated for poor work performance in response to an inquiry from them.  Plaintiff asserts that by releasing the allegedly false information to an unauthorized party, Defendant

---

[7] Defendant has not offered any legitimate, non-discriminatory reason for the alleged phone call, and so the Court's analysis need not proceed beyond the first step of the McDonnell Douglas test.

slandered him with the intention of causing him harm.   (Compl. at
¶¶ 27-28).   In response, Defendant contends that statements made
by an Amcor employee to the potential employer was both true and
privileged.

Under New Jersey law, to establish a cause of action for
defamation, a plaintiff must show: "(1) a defamatory statement of
fact; (2) concerning the plaintiff; (3) which was false; (4)
which was communicated to a person or persons other than the
plaintiff; (5) with actual knowledge that the statement was false
or with reckless disregard of the statement's truth or falsity or
with negligence in failing to ascertain the truth or falsity; and
(6) which caused damage." Badrinauth v. MetLife Corp., No. 04-
2552(PGS), 2008 WL 906459, at *4 (D.N.J. 2008) (citing
Santosuosso v. NovaCare Rehabilitation, 462 F. Supp. 2d 590, 600
(D.N.J. 2006)).   A plaintiff can not make a prima facie case of
defamation if the contested statement is essentially true.   Hill
v. Evening News Co., 715 A.2d 999, 1003 (N.J. 1998).

Further, a communication is privileged where the defendant
has a legitimate interest in the subject matter of the
communication and it is made in good faith to a person with a
corresponding interest or duty in the subject matter.   See
Bainhauer v. Manoukian, 520 A.2d 1154, 1169 (N.J. Super. App.
Div. 1987).   For example, employers generally have a legitimate
interest in responding to requests from prospective employers for

information about current or former employees.  See Kass v. Great
Coastal Express, 704 A.2d 1293, 1294 (N.J. 1998) (stating that "a
qualified privilege extends to an employer who responds in good
faith to the specific inquiries of a third party regarding the
qualifications of an employee"); Enriquez v. West Jersey Health
Sys., 777 A.2d 365, 378-79 (N.J. Super. App. Div. 2001) ("In . .
. an action brought against a former employer for publishing
defamatory information about the employee to prospective new
employers, a qualified privilege extends to the defendant who
responds in good faith to specific inquiries about the employee's
qualifications.")

Here, Wendi Fletcher, one of Amcor's Human Resources
employees, completed a form from a potential employer of
Plaintiff indicating that he was not eligible for rehire because
he was "released for performance."  Prior to releasing this
information, Amcor received a Pre-Employment Inquiry Release
signed by Plaintiff, authorizing Amcor to furnish information
regarding his employment there "without reservations."  Defendant
simply completed a form that Plaintiff expressly authorized them
to complete.  Moreover, Plaintiff has not presented any evidence
that Fletcher knew or recklessly disregarded the alleged falsity
of the statement.  Thus, the Court finds that no reasonable jury
could return a verdict in favor of Plaintiff on Count III, and
that summary judgment must therefore be entered against him.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Partial Summary Judgment is denied, while Defendant's Motion for Summary Judgment is granted in part and denied in part.  An appropriate Order will be issued.


Dated: November 4, 2009          s/ Noel L. Hillman
                                 HON. NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey